1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

LAURIE CLAYTON,                    )    Case No. CV 07-2827 JC
                                   )
                  Plaintiff,       )
                                   )    MEMORANDUM OPINION AND
         v.                        )    ORDER OF REMAND
                                   )
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social             )
Security,                          )
                                   )
                  Defendant.       )
_____   )

## I.    SUMMARY

On May 2, 2007, plaintiff Laurie Clayton ("plaintiff") filed a Complaint

seeking review of the Commissioner of Social Security's denial of plaintiff's

application for benefits.  The parties have filed a consent to proceed before a

United States Magistrate Judge.

This matter is before the Court on the parties' cross motions for summary

judgment, respectively ("Plaintiff's Motion") and ("Defendant's Motion").  The

Court has taken both motions under submission without oral argument.  See Fed.

R. Civ. P. 78; L.R. 7-15; May 4, 2007 Case Management Order, ¶ 5.

///

///

1    Based on the record as a whole and the applicable law, the decision of the

2    Commissioner is REVERSED AND REMANDED for further proceedings

3    consistent with this Memorandum and Opinion and Order of Remand.

4    **II.    BACKGROUND AND SUMMARY OF ADMINISTRATIVE**

5    **DECISION**

6    On June 11, 2003, plaintiff filed an application for Supplemental Security

7    Income ("SSI") benefits.  (Administrative Record ("AR") 71-73).  Plaintiff

8    asserted that she became disabled on August 31, 1999, due to depression,

9    fibromyalgia, chronic migraines and back problems.  (AR 71, 78).  An

10   Administrative Law Judge (the "ALJ") examined the medical record and heard

11   testimony from plaintiff (who was represented by counsel) and a vocational expert

12   on November 9, 2005.  (AR 1331-52).

13   On December 1, 2005, the ALJ determined that plaintiff was not disabled

14   through the date of the decision.  (AR 15-20).  Specifically, the ALJ found:

15   (1) plaintiff suffered from the following impairments:  fibromyalgia, migraine

16   headaches, and depression not otherwise specified, though she had no severe

17   mental impairment (AR 19); (2) plaintiff's impairment or combination of

18   impairments did not meet or medically equal one of the listed impairments (AR

19   16, 19); (3) plaintiff (a) could perform medium exertion; (b) could occasionally lift

20   and carry 50 pounds, and frequently lift and carry 25 pounds; (c) could stand and

21   walk for six hours in an eight-hour work day; (d) could sit for six hours in an

22   eight-hour work day; (e) could occasionally climb, balance, stoop, kneel, crouch,

23   and crawl; (f) had a mild to moderate restriction of activities of daily living, mild

24   to moderate difficulties in maintaining social functioning, mild to moderate

25   difficulties in maintaining concentration, persistence or pace, and no episodes of

26   decompensation of extended duration (AR 16, 19); (4) plaintiff could not return to

27   her past relevant work (AR 19); (5) there were a significant number of jobs in the

28   ///

national economy that plaintiff could perform (AR 19); and (6) plaintiff's subjective allegations were not credible.  (AR 19).

The Appeals Council denied plaintiff's application for review.  (AR 4-6).

## III.   APPLICABLE LEGAL STANDARDS

### A.   Sequential Evaluation Process

To qualify for disability benefits, a claimant must show that she is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months.  Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (citing 42 U.S.C. § 423(d)(1)(A)).  The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.  Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

In assessing whether a claimant is disabled, an ALJ is to follow a five-step sequential evaluation process:

(1)   Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is not disabled.  If not, proceed to step two.

(2)   Is the claimant's alleged impairment sufficiently severe to limit her ability to work?  If not, the claimant is not disabled.  If so, proceed to step three.

(3)   Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is disabled.  If not, proceed to step four.

///
///
///

3

(4)     Does the claimant possess the residual functional capacity to perform her past relevant work?[1]  If so, the claimant is not disabled.  If not, proceed to step five.

(5)     Does the claimant's residual functional capacity, when considered with the claimant's age, education, and work experience, allow her to adjust to other work that exists in significant numbers in the national economy?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Stout v. Commissioner, Social Security Administration, 454 F.3d 1050, 1052 (9th Cir. 2006) (citing 20 C.F.R. §§ 404.1520, 416.920).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five.  Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing Tackett); see also Burch, 400 F.3d at 679 (claimant carries initial burden of proving disability).

**B.     Standard of Review**

Pursuant to 42 U.S.C. section 405(g), a court may set aside a denial of benefits only if it is not supported by substantial evidence or if it is based on legal error.  Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006) (citing Flaten v. Secretary of Health & Human Services, 44 F.3d 1453, 1457 (9th Cir. 1995)).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (citations and quotations omitted).  It is more than a mere scintilla but less than a preponderance.  Robbins, 466 F.3d at 882 (citing Young v. Sullivan, 911 F.2d 180, 183 (9th Cir. 1990)).

To determine whether substantial evidence supports a finding, a court must ""consider the record as a whole, weighing both evidence that supports and

---

[1]Residual functional capacity is "what [one] can still do despite [ones] limitations" and represents an "assessment based upon all of the relevant evidence." 20 C.F.R. § 416.945(a).

4

1    evidence that detracts from the [Commissioner's] conclusion.'"  Aukland v.

2    Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (quoting Penny v. Sullivan, 2 F.3d

3    953, 956 (9th Cir. 1993)).  If the evidence can reasonably support either affirming

4    or reversing the ALJ's conclusion, a court may not substitute its judgment for that

5    of the ALJ.  Robbins, 466 F.3d at 882 (citing Flaten, 44 F.3d at 1457).

6    **IV.    FACTS**

7          **A.    The Medical Record and Plaintiff's Testimony**

8          At the hearing, plaintiff testified:  She suffered from migraine headache pain

9    and fibromyalgia pain that kept her down at least one day per week.  (AR 1338-

10   39).  She got migraine headaches one to four times a week, and they usually lasted

11   one to four days.  (AR 1339).  Plaintiff was then taking extra strength Vicodin for

12   her migraine headaches.  (AR 1339).  The day before she testified, she had gone to

13   the Antelope Valley Hospital with a migraine headache and was given Morphine

14   and Vistaril.  (AR 1339-40).[2]

15         The medical record is extensive.  Plaintiff sought treatment for pain

16   primarily by emergency room visits.  Plaintiff went to the Antelope Valley

17   Hospital emergency room for her migraine headaches from December 1999

18   through May 2003,[3] and May 2004 through September 2005.  (AR 464-1076,

19   1102-1318).  During that time period plaintiff visited the emergency room

20

21         [2]Plaintiff was never prescribed Morphine; she was given Morphine only when she visited

22   emergency rooms.  (AR 1341).

23         [3]In May and June 2003, plaintiff presented to the Banner Lassen Medical Center

24   emergency room six times for headaches and/or chest pains.  (AR 193-235).  From October 2003

     through June 2004, plaintiff returned to the emergency room over ten times with complaints of

25   pain and/or headaches.  (AR 272-81, 285-87, 289-92, 294-98, 301-12, 316-20, 325-29, 334-40,

26   343-51).  On November 14, 2003, Dr. Christopher Morgan diagnosed plaintiff with chronic

     headache disorder and electric shock dysesthesias and paresthesias.  (AR 322).  On December 2,

27   2003, Dr. Jack Wong diagnosed plaintiff with chronic pain syndrome, myoclonus and depression.

     (AR 307).  Plaintiff had complained to Dr. Wong of muscle twitching and pain everywhere.  (AR

28   301, 307).  Dr. Wong observed a "slight inconsistency" between plaintiff's symptoms and her

     physical presentations.  (AR 307).

1    approximately 100 times with migraine headaches.  (AR 464-906, 935-41, 949-63,

2    975-93, 1037-1076, 1102-1203, 1212-1318).

3        Clinic records from High Desert Hospital and Los Angeles County USC

4    Medical Center Neuromedicine Clinic show approximately seventeen regular

5    visits from May 2001 through September 2004 for depression, hypertension, and

6    migraine headaches.  (AR 131-51, 155-56, 161-81).[4]

7        The record also contains reports of regular visits to the Lassen County

8    Mental Health Department primarily for parenting skills classes and behavioral

9    management from June 4, 2003 through January 29, 2004.  (AR 237-61).   Plaintiff

10   first presented in crisis.  (AR 260-61).[5]   On July 10, 2003, plaintiff underwent a

11   comprehensive psychiatric evaluation by Dr. Shep Greene.  (AR 255-56).

12   Plaintiff complained that her medications were not working right and that she had

13   been feeling increasingly depressed and anxious because of a custody battle over

14   her children.  (AR 255).  Dr. Greene diagnosed plaintiff with post traumatic stress

15   disorder and major depression, recurrent, moderate, and assessed plaintiff with a

16   Global Assessment Functioning ("GAF") score of 55.[6]  (AR 256).  Dr. Greene

17

18   _____

19       [4]On September 26, 2002, plaintiff called her doctor at the High Desert Hospital, crying,
     and threatening to shoot herself if her doctor did not do something for her headaches.  (AR 136).

20   Plaintiff then complained that she had had a headache since September 12, with only temporary
     relief from pain medications.  (AR 137).  Doctors resolved her headache with Immitrex within an

21   hour.  (AR 138).

22       [5]During the intake process, plaintiff stated that she was currently attempting to acquire

23   SSI benefits and had no intention of seeking employment.  (AR 260).  She also was reported to
     have been on probation for forgery/welfare fraud from 1997-2000.  (AR 266).   Plaintiff reported

24   that she currently smoked one to two marijuana joints per month, and that she had a history of
     methamphetamine abuse for one year in 1997.  (AR 267).

25

26       [6]A GAF score is the clinician's judgment of the individual's overall level of functioning.
     It is rated with respect only to psychological, social, and occupational functioning, without regard

27   to impairments in functioning due to physical or environmental limitations.  See DSM-IV at 32.
     A GAF score from 51-60 denotes moderate symptoms (e.g., flat affect and circumstantial speech,

28   occasional panic attacks) or moderate difficulty in social, occupational, or school functioning
     (e.g., few friends, conflicts with peers or coworkers).  See DSM-IV at 32.

increased plaintiff's medications.  (AR 256).  Although Dr. Greene continued to modify plaintiff's antidepressants after this evaluation, and plaintiff thereafter continued to report depressive symptoms, Dr. Greene noted on August 7, 2003 and November 12, 2003, that plaintiff was in "behavioral control."  (AR 240, 246, 251-53).

Plaintiff underwent a total hysterectomy in October 2003.  (AR 353-60, 385-87).  At the time, her physician, Dr. Michael Osborn, reported a history of migraines with frequent emergency room visits (i.e., 2-3 times per week).  (AR 354).  A prior record from Dr. Osborn notes that plaintiff had been going to the emergency room almost three times per week, and that plaintiff's emergency room doctor had refused to give plaintiff any more pain medication.  (AR 369).[7]  Dr. Osborn diagnosed plaintiff with migraines, fibromyalgia, hypertension, depression, anxiety, chronic neck pain, and gastro-esophageal reflux disease on August 20, 2003.  (AR 380-81).[8]

Dr. Francis Riegler of Universal Pain Management prepared an Initial Comprehensive Pain Management Report dated September 13, 2005.  (AR 1321-28).  Plaintiff reportedly had been treated with a number of anti-migraine medicines but asserted that only methadone had been effective.  (AR 1322).  Dr. Riegler noted:

> [Plaintiff] reports that she experiences migraine headaches two
> to four times per week.  She will usually go to the urgent care
> three to four times per month.  Apparently, this is the limit of
> the amount of times she can receive intramuscular injections in

---

[7]On November 19, 2003, Dr. Wong noted that plaintiff had a long-standing history of migraines with possible drug abuse.  (AR 312).

[8]On October 28, 2003, plaintiff presented with neck and back pain.  (AR 332-33).  Dr. Christopher Nurre diagnosed plaintiff with exacerbation of neck pain and fibromyalgia pain with an upper back pain with some radicular symptoms.  (AR 333).  He increased plaintiff's medications and ordered x-rays which were "essentially normal."  (AR 330-31, 333).

1  a month.  She typically receives morphine with Vistaril, usually

2  10 mg of morphine with Vistaril which sometimes helps to

3  alleviate her headaches.  She reports that the only thing that has

4  been effective in helping to relieve her headaches/migraines is

5  narcotics.

6  (AR 1322).  Although the record elsewhere contains self-reports of

7  methamphetamine abuse in 1997, and plaintiff testified to the same, plaintiff

8  denied any history of drug or substance abuse to Dr. Riegler.  (AR 267, 1325,

9  1340).  As to a treatment plan, Dr. Riegler advised:

10  We are not acute pain management and we will not be

11  providing any intramuscular injections for her migrainous-type

12  headaches at any time.  The goal is to keep her out of the urgent

13  care and out of the emergency room for these headaches.  We

14  will therefore focus on providing her with medications to help

15  reduce her migrainous-type headaches and treat her

16  fibromyalgia.  ¶ Discussed with the patient that she is to receive

17  pain management medications from only Universal Pain

18  Management.  She has signed a narcotics contract which states

19  that she will receive medications from one facility and that she

20  is subject to random urine drug screens . . . .With that in mind,

21  we will resume the patient on methadone 10 mg t.i.d. #90.

22  ¶ Discussed with the patient that if in fact she does have an incredibly

23  severe migraine that warrants her need to go to the urgent care or

24  emergency room for an intramuscular injection that although we

25  discourage this practice she can go to the urgent care or emergency

26  room; however, she is not to obtain any written prescription.  If it is

27  found that she does obtain a written prescription and fill[s] that

28  ///

8

1   prescription that is grounds for discharge from Universal Pain

2   Management.

3   (AR 1326-27).

**B.     The Medical Opinions Concerning Plaintiff's Functionality**

**1.     Opinions Regarding Plaintiff's Physical Capacity**

6       On September 29, 2003, consulting physician Dr. Hal Meadows, examined

7   plaintiff and reviewed plaintiff's medical records from Dr. Osborn.  (AR 419-21).

8   The record does not reflect that Dr. Meadows reviewed records from plaintiff's

9   numerous emergency room visits.  However, Dr. Meadows did note that plaintiff

10  complained of recurrent migraines occurring four times a week.  (AR 419).

11  Among other conditions, Dr. Meadows diagnosed plaintiff with a "history of

12  migraine headaches."  (AR 420).  Dr. Meadows noted that plaintiff's ability to do

13  work-related activities on a day-to-day basis was affected "slightly" by her

14  medical problems.  (AR 421).  He opined that plaintiff could (1) lift and carry

15  twenty pounds; (2) stand about six hours in an eight-hour workday; and (3) sit

16  about six hours in an eight-hour workday.  (AR 421).  He further indicated that

17  plaintiff's use of her hands and senses was not limited.  (AR 421).

18      On October 31, 2003, Dr, Thien Nguyen, completed a Physical Residual

19  Functional Capacity Assessment form which reflects his opinion that plaintiff:

20  (1) could occasionally lift/carry twenty pounds, and frequently lift/carry ten

21  pounds; (2) could stand/walk about six hours in and eight-hour day and sit about

22  six hours in an eight-hour day; (3) had only occasional postural limitations, but

23  could not climb a rope or scaffolds; and (4) should avoid concentrated exposure to

24  fumes, odors, dusts, gasses, and poor ventilation.  (AR 422-29).[9]

25  ///

26

27      _____

[9]A reviewing physician, Dr. Sandra Clancey, affirmed Dr. Nguyen's assessment.  (AR

28  429).

9

On March 30, 2004, one of plaintiff's treating physicians, Dr. Christopher Morgan, prepared a medical report in which he opined that plaintiff was "permanently disabled" and could not work full time or part time due to the increased pain she suffered when she lifted or bended.[10]  (AR 284).  Dr. Morgan diagnosed plaintiff with migraines, fibromyalgia, hypertension, depression and asthma.  (AR 284).

Dr. Jay Dhiman conducted an internal medicine examination of plaintiff on May 22, 2005.  (AR 1077-81).  Dr. Dhiman reviewed a psychiatric evaluation for plaintiff and a November 14, 2003 progress note generated by Dr. Morgan.  (AR 342, 1077).  The record does not reflect that Dr. Dhiman reviewed any other medical records.  Dr. Dhiman reported that plaintiff had been having one to four migraines per week, but did not mention plaintiff's frequent emergency room visits.  (AR 1077).  At the time, plaintiff reportedly was taking Percocet and Soma for her migraine headaches.  (AR 1077-78).  Plaintiff reportedly could do light cooking, cleaning, mopping, vacuuming, and her own shopping, could walk for thirty minutes at a time, and could stand for one hour at a time.  (AR 1078).

Dr. Dhiman diagnosed plaintiff with fibromyalgia and chronic headaches.  (AR 1081).[11]  He opined that plaintiff:  (1) could stand and walk for six hours during an eight-hour workday; (2) had no sitting limitations; (3) could lift 25 pounds frequently and 50 pounds occasionally; (4) could occasionally bend, stoop,

---

[10]Dr. Morgan was one of the physicians who treated plaintiff at the Banner Lassen Medical Center.  See supra note 3.  Dr. Morgan prescribed plaintiff methadone, referred her to the emergency room for the time period of October 2003 through at least April 2004, and directly treated plaintiff in at least October 2003, June 2004, and November 2004.  (AR 272-83, 285-305, 308-10, 316-31, 340, 342).  When plaintiff first presented to Dr. Morgan in October 2003, she reported going to the emergency room almost every day for headaches and asked for a parenteral narcotic shot, which Dr. Morgan declined.  (AR 340).  Instead he prescribed methadone and ordered plaintiff to follow up with him in two weeks.  (AR 340, 342).

[11]CT scans of plaintiff's brain on July 5, 2005 and July 12, 2005 were essentially normal.  (AR 1138, 1140, 1150, 1154).

1  and crouch; (5) had no upper extremity limitations; and (6) had no visual,

2  communicative, or environmental limitations.  (AR 1081).[12]

3  ## 2.   Opinions Regarding Plaintiff's Mental Capacity

4  Dr. Rosalee Bradley performed a comprehensive mental evaluation of

5  plaintiff on October 28, 2003.  (AR 430-31).  Dr. Bradley noted that plaintiff had a

6  history of illegal drug use but reportedly had been clean and sober for six years.

7  (AR 431).  Dr. Bradley diagnosed plaintiff with major depression (recurrent), post

8  traumatic stress disorder (chronic), polysubstance dependence, personality

9  disorder with antisocial and dependent traits, migraine headaches, asthma,

10  fibromyalgia, carpal tunnel syndrome, and back problems.  (AR 431).  Dr. Bradley

11  assessed plaintiff with a GAF score of 55, but noted that plaintiff could:

12  (1) understand, remember and carry out simple and complex instructions;

13  (2) respond appropriately to coworkers, supervisors, and the public; (3) respond

14  appropriately to usual work situations; and (4) deal with changes in a routine work

15  setting.  (AR 431).

16  On November 13, 2003, a medical consultant completed a Psychiatric

17  Review Technique form in which the consultant opined that plaintiff's

18  impairments were not severe, and that plaintiff had only mild restrictions in

19  maintaining social functioning, and in maintaining concentration, persistence or

20  pace.  (AR 432-45).

21  On March 25, 2004, Dr. Rosemary Tyl completed a Mental Residual

22  Functional Capacity Assessment form in which she opined that plaintiff (1) was

23  moderately limited in her ability to (a) understand, remember and carry out

24  detailed instructions; (b) complete a normal work-day and work-week without

25  interruptions for psychologically based symptoms, and to perform at a consistent

26

27  _____

28  [12]On June 4, 2005, Dr. Dhiman completed a Medical Source Statement of Ability to Do
Work-Related Activities (Physical) echoing these limitations.  (AR 1082-85).

1  pace without an unreasonable number and length of rest periods; and (c) interact
2  appropriately with the general public; (2) had a mild restriction in activities of
3  daily living; and (3) had moderate difficulties in maintaining social functioning in
4  maintaining concentration, persistence and pace.  (AR 446-48, 460).

5  On May 11, 2005, Dr. Dan Matzke conducted a psychological evaluation of
6  plaintiff.  (AR 1086-91).  Dr. Matzke noted that plaintiff drove to her appointment
7  by herself and reportedly did food shopping, cooking and laundry with the help of
8  her children.  (AR 1089).  Dr. Matzke diagnosed plaintiff with depressive disorder
9   not otherwise specified and assigned her a GAF score of 55.  (AR 1090).  Dr.
10 Matzke opined that plaintiff had limitations but could satisfactorily or adequately:
11 (1) conduct daily/domestic activities; (2) maintain social functioning;
12 (3) understand, remember and carry out simple instructions; and (4) deal with
13 changes in a routine work setting.  (AR 1090-91).  Dr. Matzke also noted that
14 plaintiff had marked limitations in, but was still capable of:  (1) maintaining
15 concentration, persistence and pace; (2) maintaining emotional stability in work-
16 like situations; (3) understanding, remembering and carrying out complex job
17 instructions; (4) responding appropriately to co-workers, supervisors, and the
18 public; and (5) responding appropriately to work situations/requirements. (AR
19 1090-91).[13]

20 **V.   DISCUSSION**

21 Plaintiff asserts, inter alia, that the ALJ allegedly erred by failing properly to
22 evaluate the medical evidence when the ALJ found that plaintiff could perform
23 medium work on a sustained basis.  (Plaintiff's Motion at 3-11).  This Court
24 concludes that a remand is appropriate because the ALJ appears to have
25 ///

26

27        [13]Also on May 11, 2005, Dr. Matzke completed a Medical Assessment of Ability to Do
28 Work-Related Activities (Mental) echoing these limitations.  (AR 1100-01).

1   overlooked the opinion of a treating physician that plaintiff was permanently

2   disabled.

3       In finding that plaintiff could do medium work on a sustained basis, the ALJ

4   adopted Dr. Dhiman's consultative opinion. (AR 16). The ALJ stated that he

5   gave significant weight to Dr. Dhiman's opinion because Dr. Dhiman examined

6   plaintiff and Dr. Dhiman's conclusions were "not rebutted by any treating source."

7   (AR 16). In so reasoning, the ALJ apparently overlooked treating physician Dr.

8   Morgan's opinion that plaintiff was permanently disabled, and could not work full

9   time or part time. (AR 284).

10      While a consultative opinion, if supported by independent clinical findings,

11  may serve as substantial evidence to support a disability determination, Orn v.

12  Astrue, 495 F.3d 625, 632 (9th Cir. 2007), an ALJ may not adopt a consultative

13  opinion over that of a conflicting treating physician's opinion without adequate

14  discussion.[14] When, as here, a treating physician's opinion is contradicted by

15  another examining physician, the ALJ may not reject the treating physician's

16  opinion without providing specific, legitimate reasons based on substantial

17  evidence in the record. Orn, 495 F.3d at 632; Thomas v. Barnhart, 278 F.3d 947,

18  957 (9th Cir. 2002) (citations and quotations omitted). An ALJ need not recite

19  "magic words" to reject a treating physician's opinion, and therefore, a court may

20  draw specific and legitimate inferences from an ALJ's opinion. Magallanes v.

21  Bowen, 881 F.2d 747, 755 (9th Cir. 1989). However, "[t]he ALJ must do more

22  than offer his conclusions." Embrey v. Bowen, 849 F.2d 418, 421-22 (9th Cir.

23  1988). "He must set forth his own interpretations and explain why they, rather

24  than the [physician's], are correct." Id.

25  _____

26      [14]In general, the opinion of a treating physician is entitled to greater weight than that of a
    non-treating physician because the treating physician "is employed to cure and has a greater
27  opportunity to know and observe the patient as an individual." Morgan v. Commissioner, 169
    F.3d 595, 600 (9th Cir. 1999) (citing Sprague v. Bowen, 812 F.2d 1226, 1230 (9th Cir. 1987)).
28

1    Here the ALJ erred by failing to address Dr. Morgan's opinion. By such
2    omission and the adoption of the contrary opinion of Dr. Dhiman, the ALJ
3    effectively rejected Dr. Morgan's opinion without providing specific and
4    legitimate reasons for doing so. Although the ALJ might nonetheless have chosen
5    to adopt Dr. Dhiman's opinion over that of Dr. Morgan, this Court cannot so
6    conclude on this record. On remand, the Administration should evaluate the
7    treating and examining source opinions pursuant to the provisions of 20 C.F.R.
8    section 416.927 and Social Security Rulings 96-2p and 96-5p, and explain the
9    weight given to such opinion evidence.

10   **VI.    CONCLUSION**[15]

11       For the foregoing reasons, the decision of the Commissioner of Social
12   Security is reversed in part, and this matter is remanded for further administrative
13   action consistent with this Memorandum Opinion and Order of Remand.[16]

14       LET JUDGMENT BE ENTERED ACCORDINGLY.

15   DATED:  September 26, 2008

16                                    _____/s/_____
17                                    Honorable Jacqueline Chooljian
                                      UNITED STATES MAGISTRATE JUDGE
18
19
20
21
22
23   [15]The Court need not, and has not adjudicated plaintiff's other challenge to the ALJ's
     decision, except insofar as to determine that a reversal and remand for immediate payment of
24   benefits would not be appropriate.
25   [16]When a court reverses an administrative determination, "the proper course, except in
     rare circumstances, is to remand to the agency for additional investigation or explanation."
26   Immigration & Naturalization Service v. Ventura, 537 U.S. 12, 16 (2002) (citations and
     quotations omitted).  Remand is proper where, as here, additional administrative proceedings
27   could remedy the defects in the decision. McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir.
28   1989).